# EXHIBIT 2

**AFFIDAVIT OF SPECIAL AGENT TODD F. PROUGH**

I, Todd F. Prough, being duly sworn, depose and state as follows:

1. I am a Special Agent with the Drug Enforcement Administration ("DEA") of the United States Department of Justice, and have been so employed since 1997. I am currently assigned to the New England Field Division's Tactical Diversion Squad in Worcester, Massachusetts. Prior to joining the DEA, I was employed for approximately three years as a detective with the Lycoming County District Attorney's Office in Lycoming County, Pennsylvania. During my law enforcement career, I have received specialized training regarding the activities of drug traffickers, including the methods used to package, store, and distribute drugs, and the methods used by drug traffickers to conceal and launder the proceeds of their drug trafficking activities.

2. In addition to my training, I have extensive experience in the investigation of the activities of drug traffickers. Since joining the DEA, I have participated in many drug investigations. I have debriefed more than one-hundred defendants, informants, and witnesses who had personal knowledge about drug trafficking activities and the operation of drug trafficking organizations. I have

participated in all aspects of drug trafficking investigations, including conducting surveillance, using confidential informants, acting in an undercover capacity, and conducting court-authorized interceptions of wire and electronic communications. During my law enforcement career, I have also participated in the preparation and/or execution of many search warrants.

3. This affidavit is made in support of a criminal complaint charging Bryan MORAN, currently an inmate at the Middlesex County House of Corrections ("MCHOC") in Billerica, Massachusetts, with possession with intent to distribute fentanyl, a Schedule II controlled substance, in violation of 21 U.S.C. § 841, and conspiracy to possess with intent to distribute fentanyl, a Schedule II controlled substance, in violation of 21 U.S.C. § 846.

4. This affidavit is based upon information I have gained from my investigation, my training and experience, as well as information from other law enforcement officers. Because this affidavit is submitted for the limited purpose of securing an arrest warrant, I have not included each and every fact known to me concerning the investigation. I have set forth only the facts that I believe are necessary and sufficient for the criminal complaint.

5. On March 22, 2016, Bryan MORAN ("MORAN") was arrested by the Melrose Police officers in Melrose, Massachusetts pursuant to an arrest warrant charging him with a violation of probation. The following day, MORAN was incarcerated at the MCHOC.

6. On or about March 29, 2016, Wilmington Police Department Detective John Bossi ("Detective Bossi"), who had been investigating MORAN, learned from investigators at the MCHOC that MORAN made a telephone call the previous day to his girlfriend Tina TOMASI ("TOMASI")[1]. During that call, which was recorded, TOMASI told MORAN that MORAN's sister, Alysha Moran (hereinafter "A. MORAN"), received a letter from her landlord informing her that maintenance was going to be done at her residence located in North Reading, Massachusetts, and that she needed to empty her storage unit.[2] During the same phone call between MORAN and TOMASI, MORAN instructed TOMASI to call A. MORAN and have her join TOMASI and MORAN's ongoing phone conversation by conference call, which she did. After A. MORAN joined the conversation, MORAN told A. MORAN that she needed to move

---

[1] Non-privileged inmate telephone calls are routinely recorded at the MCHOC. Each call has an audible preamble warning participants that the call is being recorded and advising participants that they have a right to remain silent, but that anything said could be used against the participant and could be provided to state and/or federal prosecutors.
[2] Investigators later confirmed that on or about March 28, 2016 a letter was sent to A. MORAN by her landlord explaining that scheduled maintenance required her to empty her storage unit.

3

his belongings that night and, "You know what you need to do, just do it." A. MORAN then complained about having to move all of MORAN's belongings. MORAN replied that she (A. MORAN) did not need to move everything, but rather, "right when you open the door." A. MORAN responded, "Shut up, I know."[3]

7. On March 29, 2016, officers from the Wilmington and North Reading Police Departments went to A. MORAN's residence in North Reading, Massachusetts. Detective Bossi and North Reading Police Lieutenant Thomas Romeo, ("Lieutenant Romeo") met with A. MORAN at her residence. Detective Bossi informed A. MORAN that investigators had been monitoring MORAN's prison calls and believed that he was storing controlled substances in her apartment and storage unit. A. MORAN immediately told Detective Bossi and Lieutenant Romeo that they could search her apartment and storage unit. Shortly thereafter, she signed a "consent-to-search" form, permitting the search of, among other things, her storage unit. (She also gave Detective Bossi and Lieutenant Romeo a key to the storage unit.)

8. Shortly thereafter, law enforcement officers, after searching A. MORAN's apartment, went to her storage

---

[3] Based on my training and experience and the facts of this case, I believe that MORAN was instructing A. MORAN to remove illegal drugs and/or contraband from her storage unit.

4

unit, which was located inside her apartment complex, and opened it with the key A. MORAN gave them. Inside the unit, officers found several black garbage bags containing men's clothing and documents in the name of MORAN. In one of the bags, they found a smaller plastic bag containing white powder. The white powder, which weighed approximately 80 grams, field-tested positive for the presence of fentanyl. The suspected fentanyl was subsequently sent to a DEA laboratory and was determined to contain fentanyl.[4] Also found in the same black garbage bag that contained the bag of fentanyl were a digital scale and a box of plastic sandwich bags.[5]

9. After the search, Detective Bossi informed A. MORAN and Carli FARETRA ("FARETRA"), who had just arrived at A. MORAN's residence, that officers found a large amount of suspected drugs in MORAN's belongings.[6]

---

[4] According to information from the DEA, and based on my training and experience, fentanyl is a potent synthetic opioid that is approximately one-hundred times more powerful than morphine as an analgesic, and is approximately fifty times more powerful than heroin. Fentanyl is potentially lethal, even at very low levels. For example, ingestion of fentanyl in a dose as small as 0.25 mg can be fatal. Fentanyl's euphoric effects are indistinguishable from morphine or heroin.

[5] Based on my training and experience and the facts of this case, the quantity of fentanyl recovered at A. MORAN's storage unit is an amount consistent with distribution rather than personal use. Also based on my training and experience and the facts of this case, that quantity of fentanyl, along with the presence of the scale and small plastic bags, indicate that the fentanyl was intended to be distributed to others.

[6] During the investigation, I learned that FARETRA and MORAN were previously involved in a romantic relationship and have a child together.

10. Later that evening, MORAN placed a call from the MCHOC to A. MORAN's phone, which was answered by FARETRA. The call was recorded. During that call, FARETRA told MORAN that the police had searched A. MORAN's residence and found, among other things, an amount of white powder in the storage unit. FARETRA also told MORAN that he and TOMASI had been under police surveillance before MORAN had been incarcerated on the probation violation. FARETRA stated, "This house is not yours and you brought it to their house, into their storage." MORAN stated, "Yeah, but it's my shit."[7]

11. Also on March 29, 2016, during a recorded interview with law enforcement officers, A. MORAN stated that during the previous week, MORAN had asked to store his belongings, which consisted of several black plastic garbage bags, at her residence. Also according to A. MORAN, she agreed to let MORAN store the black plastic garbage bags at her residence. However, because the bags took up too much space inside her apartment, she instructed MORAN to place the bags in her storage unit, which he did.

12. Also during the interview on March 29, 2016, A. MORAN told law enforcement officers that the day after

---

[7] Based on my training and experience and the facts of this case, I believe that MORAN was stating that the fentanyl found by law enforcement officers in A. MORAN's storage unit belonged to him.

6

MORAN stored the black plastic garbage bags in her storage unit, she learned that he had been arrested in Melrose. She subsequently went to the Melrose Police Department to retrieve MORAN's personal property. When she picked up MORAN's personal property, she saw that the key to her storage unit was among his possessions. According to A. MORAN, when she later gave officers consent to search her residence and storage unit, she provided them with that key to her storage unit. During the interview with law enforcement officers, A. MORAN further stated that she had not been in the storage unit for several months; and that she was aware that MORAN sold heroin in the past, but assumed he had recently stopped.

13. On March 30, 2016, during a recorded interview with law enforcement officers, TOMASI stated that she knew that MORAN distributed heroin. She also stated that when MORAN was previously incarcerated in November 2015, he initially stored his belongings at TOMASI's residence. During that time, according to TOMASI, some of MORAN's bags of belongings contained numerous plastic bags containing a white powder that she assumed was heroin. TOMASI also told law enforcement officers that she was aware that MORAN had stored his belongings at A. MORAN's residence when he was arrested in March 2016.

7

14. During a recorded interview On April 6, 2016, MORAN told law enforcement officers that the bags found by police in A. MORAN's storage unit belonged to him, and that the fentanyl, the digital scale and the plastic sandwich bags found in the storage unit also belonged to him. According to MORAN, he was unsure of how much fentanyl was in the storage unit.

**CONCLUSION**

15. Based on the foregoing, there is probable cause to believe that in or about March 2016, Bryan MORAN committed a violations of 21 U.S.C. §§ 841 and 846.

_____
Todd F. Prough
Special Agent
Drug Enforcement Administration


Subscribed and sworn to before me at Boston, Massachusetts this 3rd day of May, 2016

_____
JENNIFER C. BOAL
UNITED STATES MAGISTRATE JUDGE