UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| UNITED STATES OF AMERICA | * | |
|---|---|---|
| | * | |
| v. | * | Criminal No. 16-10184-IT |
| | * | |
| BRYAN MORAN, | * | |
| | * | |
| Defendant. | * | |

MEMORANDUM & ORDER

October 5, 2017

TALWANI, D.J.

Before the court is Defendant Bryan Moran's Motion to Suppress [#54]. Moran seeks an order suppressing the fruits of an allegedly unlawful search of bags he stored in his sister's locked storage unit. Id. In particular, Moran seeks suppression of the fentanyl found in those bags on March 29, 2016, and described in the Indictment [#24]. After review of the parties' papers, and the evidence and testimony received at the three-part evidentiary hearing,[1] the court DENIES the Motion [#54].

I. Factual Background[2]

A little over a week preceding the search that is the subject of the pending motion, Moran left a "sober home" in Malden, MA, where he had been residing. He contacted his sister, Alysha, and asked to store his belongings at her apartment. That evening, Moran placed large garbage bags along a hallway inside Alysha's apartment.

---

[1] The evidentiary hearing was held on August 15 and 17, and September 8, 2017. [#101]. Among the exhibits received into evidence was a recording of a police interview of Alysha Moran, excerpts of which were also played in court. See Ex. 8.

[2] Additional facts will be set forth in the analysis where relevant.

On March 21, 2016, Moran returned to Alysha's apartment. Moran attempted to place some bags in various closets in Alysha's apartment, but Alysha ultimately directed Moran to put the bags in her storage unit, located in another building in the same apartment complex. With the exception of one bag which was stored behind Alysha's washing machine, the bags were placed in the storage unit, and Moran left with the only key.

On March 22, 2016, Alysha called Wilmington Police Detective John Bossi, with whom Alysha had been in contact for a number of years. She told Bossi that she had been called and threatened by someone named Miguel whom she thought—from context and from conversations with a friend—to be Moran's supplier.[3] [#61-1]. She stated that this supplier explained that Moran both owed him money and told him to contact Alysha were Moran unreachable. Scared for her own safety and for Moran's, Alysha told Bossi that Moran was on the run and with a friend named Mike, in Melrose. She asked Bossi whether she should pay the supplier; Bossi directed her not to, and instead alerted Moran's Probation Officer (whom Bossi could not reach) and the North Reading Police Department.

The same day—March 22—Moran was arrested on a probation violation in Melrose and brought to the Middlesex County Billerica House of Corrections. Alysha went to the Melrose Police Department and picked up Moran's belongings. These belongings included the key to the storage unit, though it is unclear whether she knew this at the time.

On March 29, 2017, Moran placed a recorded call from Billerica, to his girlfriend, Tina Tomasi. Ex. 1A. Tomasi explained that Alysha had received a letter from her landlord stating that she needed to empty the storage unit to allow for repairs. Moran inquired further about the letter, and asked Tomasi to dial Alysha into the call, "because that's making [him] a little

---

[3] Further evidence indicates that Alysha reported that Miguel threatened to kidnap and rape her were Miguel not paid.

nervous." Upon joining the call, Alysha (sounding distraught) explained she could not locate the key to the storage unit. Moran responded that the key was with the belongings Alysha picked up from the Melrose Police Department, and he began to instruct Alysha to move his bags out of the storage unit, stating, "All right, all right, all right, I'm done talking on the phone for like. You know what the fuck you need to do, like, just do it. I don't know what to say because I can't – I'm in here like." She responded: "All right, all right, I know." As Alysha expressed uncertainty as to how she would be able to move everything from out of the unit, Moran reassured her that she did not need to move everything, but only that which is there "right when you open the door." Alysha directed Moran to "shut up," and Moran later stated "Everything's good, kid, I don't want you like stressed out, like if anything, handle it now. I don't want to keep talking about it. This shit's recorded, like." Alysha finally stated: "I'll figure it out. I don't know. It's all set. I'll just figure it out. I love you." Moran responds: "Love you."

Having recorded and listed to this call, Billerica staff contacted Bossi and relayed the call's contents.[4] Bossi dispatched Detective Dindo to surveil the apartment complex, and Bossi, along with two other officers—Lieutenants Romeo and Pupa—went to Alysha's apartment. When Alysha did not respond to their knock on the door, Bossi called Alysha and asked that she come speak with him at the apartment. She did, and upon being told that the officers were investigating Moran for drugs, she consented to their entry and search of her home for Moran's possessions.

The testimony from the officers and Alysha as to their presence and conduct in the apartment diverges, and there is some dispute as to the facts surrounding Alysha's opening of her

---

[4] As explained *infra*, police were also aware of prior calls Moran placed from jail, including a November 2015 call in which Moran contemplates Alysha's accessing other belongings he left with her while incarcerated.

own safe, which revealed roughly a pound of marijuana, pipes, and a scale.[5] It is uncontested, however, that Alysha volunteered to officers $2,200 in cash located in the pocket of her bathrobe that she said belonged to Moran, and there is little to no evidence regarding any resistance put forth to a search for, or of, *Moran's* belongings.

During the search, Detective Hatch was instructed to bring a "consent to search form" for Alysha to sign. Although Hatch and Alysha provided varying accounts of the specifics of how she went about signing the form, Alysha did in fact sign the form [#61-3], stating her consent to search her apartment, storage unit, and vehicle. Alysha ultimately escorted Hatch to her vehicle (which he searched, including a bag belonging to Moran), provided him the key to the storage unit (which was located in the central console inside the car), and then escorted officers to the storage unit where Hatch opened the door. Alysha differentiated the contents of the unit, stating the black bags belonged to Moran while the boxes containing Christmas decorations belonged to her. Although it is unclear whether Alysha gave express consent to search Moran's bags, it is undisputed that she did not limit her written consent or object to any portion of the search. She walked away to retrieve her child from the school bus, and officers began their search.

They removed the bags from the storage unit, and allowed a canine who arrived at the scene to test for drugs. The canine was not trained to detect fentanyl, and did not alert. Nonetheless, the officers searched the bags and discovered in them the fentanyl at issue in this case. No warrant was ever applied for or secured. Alysha was never arrested or charged.

Alysha was later interviewed by Bossi and DEA Special Agent Prough. Alysha stated at the interview she had not known the bags contained fentanyl.

This motion followed.

---

[5] The presence of the scale in the safe is not mentioned in the police reports or affidavits [#61-1, #61-2, #86-1], but was elicited in Bossi's testimony.

4

II.     Discussion

In a criminal trial, a court may suppress evidence obtained via conduct violative of the defendant's constitutional rights. Moran requests this remedy based on the following assertions: that threats, intimidation, and an informant-esque relationship with police, together rendered Alysha's consent involuntary and thus inadequate as an exception to the Fourth Amendment's general prohibition of warrantless searches. He further argues that even were Alysha's consent genuine, she possessed neither actual nor apparent authority to give it, and was in any event unable to serve as justification for the police's search because she herself was a confidential informant. The government rejects these arguments, and contends further that Moran lacked any Fourth Amendment protections in the bags at all.

The court notes that while Moran must first demonstrate the Fourth Amendment's extension to the bags, the government then bears the burden of demonstrating its compliance therewith. Illinois v. Rodriguez, 497 U.S. 177, 181 (1990) (government's burden to prove constitutional compliance); Rawlings v. Kentucky, 448 U.S. 98, 104 (1980) (defendant's burden to prove constitutional protections).

A.  *Fourth Amendment's Applicability - Expectation of Privacy*

The Fourth Amendment only prohibits intrusions upon reasonable expectations of privacy. See United States v. Gamache, 792 F.3d 194, 198 (1st Cir. 2015). Courts divine privacy expectation via both "subjective and objective criteria: the complainant must have an actual expectation of privacy, and that expectation must be one which society recognizes as reasonable." Vega-Rodriguez v. Puerto Rico Telephone Co., 110 F.3d 174, 178 (1st Cir. 1997).

i. Subjective Prong

The "relevant question" as to Moran's subjective, actual expectation of privacy in the bags is whether he sought "to preserve as private" the evidence therein. See United States. v. Rheault, 561 F.3d 55, 59 (1st Cir. 2009) (quoting Katz v. United States, 389 U.S. 347, 351 (1967)). Even where a defendant hides evidence to evade a subpoena, such evinces sufficient actual expectation so as to satisfy this aspect of the inquiry. Id.

Here, Moran maintained a subjective expectation of privacy in the bags. The record is replete with Moran's intentions to maintain the secrecy of the bags' contents: the bags were opaque, kept in a locked storage unit, and entrusted to Alysha—a close family member. His instructions to Alysha to remove the bags lest they be discovered during maintenance of the unit further militates in favor of his subjective expectations. Moran's instructions to Alysha to remove the bags may evince a lack of subjective privacy expectations as to his sister, specifically, but nothing in the record presented to this court indicates that Moran wished anything other than that the contents of his bags remain guarded from public inspection.

ii. Objective Prong

While a closer call, Moran's actual expectation was reasonable. Although "an individual does not have an expectation of privacy in items or places he exposes *to the public*," see United States v. Bucci, 582 F.3d 108, 116-17 (1st Cir. 2009) (emphasis added), a "person generally has an expectation of privacy in items he places in a closed container."[6] United States v. Meada, 408 F.3d 14, 23 (1st Cir. 2005).

---

[6] While that court's analysis ultimately centered on whether the container (a gun case) so betrayed its contents as to fall under the "plain view" exception, what remains is the general reasonableness of one's expectations of privacy in closed containers.

The First Circuit's decision in United States v. Infante-Ruiz, 13 F.3d 498, 501 (1st Cir. 1994), is instructive on the facts presented by the instant case. There, the defendant and two associates were traveling together in a car. The police arrested the defendant and removed him from the immediate presence of the vehicle. The officers asked for consent to search the car, which the driver (not the defendant) provided; the officer asked for a key to the trunk, which the driver provided, without explicit consent to a search of the trunk but without objection to such a search. Inside the trunk were two suitcases: the driver identified one as his, and the other as the defendant's. The officer searched both briefcases without express consent but without objection from the driver or the defendant; the defendant's briefcase was unlocked. The defendant's briefcase contained a gun, which served as the basis for the prosecution.

The district court found that the defendant left the unlocked briefcase in the trunk of the car "for a period of some days, even when he was not a passenger, and that he allowed [the driver] and others to place possessions of their own inside it." The district court felt compelled by these facts to find the briefcase "was not under the control of the defendant," eviscerating a privacy expectation.

The First Circuit disagreed, drawing a contrast with the Supreme Court's decision in California v. Greenwood, 486 U.S. 35 (1988), where the Court found there was no privacy expectation in trash bags left on the curb. The First Circuit held the facts of that case "clearly distinguishable," noting that:

> Storing items inside a closed briefcase inside a locked car trunk did not reveal a willingness on the part of [the defendant] to 'expose' such items to the public. Moreover, nothing in the circumstances indicated that [the defendant] had abandoned the briefcase, relinquished authority over it, or left it open to 'public inspection and consumption.' . . .
>
> [W]hile there is evidence that [the defendant's] confederates felt entitled to place items of their own within it, [the defendant] did nothing to indicate its availability to

7

> the public generally nor did his actions betray an intention to forego an owner's normal right to exclude those he wished to exclude. . . . [W]e think it clear, therefore, that [the defendant] did not repudiate his privacy interest in the briefcase by placing it in the trunk of the Mazda. While he indicated a willingness to share access with a few friends, he in no way opened the case to public access. We therefore hold that [the defendant] had a privacy interest in the briefcase and that the district court's finding to the contrary was in error.

Infante-Ruiz, 13 F.3d at 500-02 (citing Greenwood, 486 U.S. at 40-41).

Similarly, in United States v. Fultz, 146 F.3d 1102 (9th Cir. 1998), the defendant (recently evicted and essentially homeless) stored cardboard boxes in a third party's garage. The defendant never gave the third party authority to look in the boxes, and the third party never claimed a right of access to them. Noting that the defendant in that case was (for all intents and purposes) homeless and that said boxes thus constituted his sole means of protecting his belongings, the Ninth Circuit held he had an expectation of privacy in the boxes. In contrast, in United States v. Melucci, 888 F.2d 200, 202 (1st Cir. 1989), a defendant lacked standing[7] to challenge the search of an apartment the defendant rented in a false name, where the defendant had not paid rent for two months, the landlord had changed the locks after taking back possession, and the lease had expired.

Here, there appears little material difference between, on one hand, the reasonableness of expecting privacy in a suitcase which one leaves in a car trunk and to which one allows a few others access, as in Infante-Ruiz, and on the other, the reasonableness of expecting privacy in black bags one leaves in a family member's locked storage unit and to which one allows that family member access. Moran had not abandoned his property as did the defendant in Melucci,

---

[7] The court notes that "standing," in the Fourth Amendment context, is tantamount to the question of whether a defendant has an expectation of privacy for Fourth Amendment purposes. See United States v. Sanchez, 943 F.2d 110, 113 n.1 (1st Cir. 1991)

8

but instead, in circumstances not unlike the defendant in Fultz, took what steps he could to shield the bags from public exposure.

Such a conclusion is further consistent with Bucci, 582 F.3d at 116, where the First Circuit found it clear that a defendant lacked both subjective and objective expectations of privacy in a driveway and garage exposed to the street and viewable by a camera fixed on a utility pole; by sharp contrast, Moran shielded the contents of his bags not just with the bags themselves, but via placing them within a locked storage unit which police needed to obtain a key to enter. There is no evidence that the contents of the bags were at all exposed to anyone not intruding upon a private location, and as such, Moran's privacy expectations were reasonable.

The court acknowledges the government's point that Moran did not retain a key to the storage unit once he was jailed, and that Moran had appeared perfectly amenable to the bags being placed in Alysha's more heavily-trafficked apartment rather than in the arguably more restrictive storage unit. But at bottom, the court cannot find Moran's actions to constitute relinquishment, abandonment, or public exposure of his belongings such that the Fourth Amendment does not attach.

*B. Exceptions to Prohibition of Warrantless Searches – Consent*

Warrantless searches of constitutionally-protected places are presumptively unreasonable, and thus presumptively unconstitutional. Here, the relevant question is consent: whether "voluntary consent has been obtained, either from the individual party whose property is searched, or from a third party who possesses common authority over the premises." Illinois v. Rodriguez, 497 U.S. 177, 181 (1990). The government bears this burden, both as to the voluntariness of the consent and the authority to consent. Id. The "reasonableness" standard

imbued in Fourth Amendment jurisprudence dictates that authority may be actual or apparent. Id. at 186.

Moran argues that Alysha's consent was involuntary, without either actual or apparent authority, and (independently) invalid because Alysha was a confidential informant (which the government denies). The court takes these questions in turn.

    i.    Voluntariness

"For consent to a search to be valid, the government must prove by a preponderance of the evidence that the consent was uncoerced." United States v. Bey, 825 F.3d 75, 80 (1st Cir. 2016). "Determining whether an individual's consent was indeed voluntary or instead the product of coercion requires a highly fact-specific inquiry dependent upon a careful scrutiny of the totality of the circumstances," common factors being the consenter's "age, education, experience, knowledge of the right to withhold consent, and evidence of coercive tactics." See United States v. Brake, 666 F.3d 800, 806 (1st Cir. 2011).

Moran asserts that various factors militate in favor of finding that Alysha's consent was not voluntary: that police "had already searched the apartment and uncovered evidence consisting of cash and marijuana which incriminated" Alysha, thereby creating a coercive environment in which she would feel compelled to consent; and that Alysha "was also waiting the arrival of her other young child from the school bus," which would have pressured her into ending the encounter by consenting.

Lending support to this argument, Alysha testified to a combative environment in which she felt outnumbered and surprised by the officers' presence in the secured common area of her building. She testified that Romeo yelled and acted aggressively, and to what she perceived as threats by the officers to involve the Department of Children and Families and thereby threaten

10

her custody of her children. She further testified to resisting any search into her safe and to the possibility that Romeo may have falsely represented having a warrant. Finally, Alysha testified that she did not read or fully understand the "consent to search" form presented to her by Hatch.

Bossi, Hatch, and Romeo all testified to a more cooperative environment, in which they never threatened Alysha and in which Alysha calmly provided consent for, and assistance with, the police officers' search.

After considering these opposing versions of events, the court finds Alysha's consent to the search of the bags in the storage unit voluntary. It is undisputed that Alysha had called upon Bossi for help in securing Moran's arrest for the purpose of preventing further risk of overdose or other harm to Moran. She also expressed to him her fears relating to Moran's supplier – a potential threat that presumably would continue so long as Moran left her with the bags. It is further undisputed that Alysha voluntarily returned to her apartment the day of the search when Bossi asked her to do so. Further, Alysha does not contest that she signed the consent form without objection, handed over the storage room key to police, and accompanied them to the storage unit and identified and differentiated its belongings.

Importantly, in contrast to any resistance by Alysha or aggression by the officers that Alysha testified as taking place within her apartment and with regard to the search of her apartment, there is nothing in the record to indicate *any* resistance or coercion as to the storage unit—which is the crucial question. Further, Alysha went to the police station voluntarily to be interviewed by Bossi and Prough, and the recording of that interview does not indicate any coercion or undue persuasion on the part of the police. In that interview, Alysha is specifically asked whether she consented to the search of her apartment and storage unit, and she unequivocally answered "yes."

In this totality of circumstances, the court finds that Alysha's consent was voluntarily provided and thus valid to the extent she had authority. The question therefore is whether the extent of that authority reached the bags.

    ii.    Actual Authority

In <u>United States v. Matlock</u>, 415 U.S. 164 (1974), the Supreme Court held that persons possessing "common authority over or other sufficient relationship to the premises or effects sought to be inspected" may validly consent to a search, and outlined this "common authority" thusly:

> Common authority is, of course, not to be implied from the mere property interest a third party has in the property. The authority which justifies the third-party consent does not rest upon the law of property, with its attendant historical and legal refinements, <u>see</u> <u>Chapman v. United States</u>, 365 U.S. 610, 81 S.Ct. 776, 5 L.Ed.2d 828 (1961) (landlord could not validly consent to the search of a house he had rented to another), <u>Stoner v. California</u>, 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964) (night hotel clerk could not validly consent to search of customer's room) <u>but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.</u>

<u>Id.</u> at 171 n.7 (emphasis added).

In <u>United States v. Casey</u>, 825 F.3d 1, 13-14 (1st Cir. 2016), the First Circuit characterized <u>Matlock</u> as recognizing common authority to arise from "a shared privacy interest," such that "mutual use," rather than "mere joint access," serves as the benchmark for a determination of actual authority.

Moran argues that the government proffers insufficient facts demonstrating Alysha's "mutual use" or "joint access or control" over the bags "for most purposes," and that Alysha therefore lacked the requisite authority to waive Moran's rights. The court disagrees.

12

First, the evidence clearly demonstrates that at the time of the consent, Moran had already directed Alysha to take control of the bags without caveat or limitation—and that Alysha alone had access to the bags at that time.

Further, the evidence indicates a pattern and practice of Moran's leaving property with Alysha with anticipation of her not simply safeguarding it, but also accessing it. In November 2015, during a call made from the Billerica House of Corrections following an earlier arrest, Moran and Alysha explicitly discussed Alysha's need to access property Moran had left with her in order to supply Moran's clients while Moran was incarcerated. See, e.g., Ex. 4A (Moran: "Yeah, but people are going to be calling, and you're going to have to go see them, Alysh."). During that call, Alysha expressed a willingness and the ability to access Moran's bags should the need occur. See id. (Moran: "Yeah, but, then, what are you going to do? Go to the storage everyday, every second you have to go get it? Like –." Alysha: "No. I'm going to weigh up the first two things you said."). Alysha's report that Moran's supplier contacted her at Moran's direction in connection with the recent events is consistent with this past arrangement.

Both the earlier and more recent recorded calls include Alysha's concerns that she and Moran were talking in too great of detail over a recorded line, and Moran's entrustment to Alysha of a non-defined task regarding her taking possession of the bags—and both militate in favor of finding that Alysha had "joint access or control for most purposes" and thus authority to consent to a search. See Matlock, 415 U.S. at 171 n.7. In other words, rather than retaining passive access with no actual use over property, the evidence indicates Moran's acquiescence and general expectations of Alysha's active

13

engagement and control over the property. Moran, in soliciting Alysha's cooperation in the bags, thus "assumed the risk" that Alysha might permit the bags to be searched. Id.

A helpful contrast is drawn by this court's decision in United States v. Childs, 2008 WL 941779 (D. Mass. April 4, 2008). There, during a search of a third party's home, the third party told police the defendant owned a black bag located in the closet of the third party's daughter's bedroom. The third party indicated no knowledge of the bag's contents, and there was no evidence that the defendant shared control over the bag, entrusted the bag to another, or relinquished authority over the bag—it merely existed in the third party's home. Because there the third party appeared only passively aware of the bag's presence in the home, the court concluded she lacked the authority necessary to permit the bag's search. Here, however, Alysha appears far from passive: she directed that the bags be moved from her apartment to the storage unit; she was at least somewhat aware of the bags' contents; she had previously been willing and able, with Moran's knowledge, to access property Moran had stored with her; and she was explicitly told by Moran to take control of the bags before the storage unit was opened for repairs.

Accordingly, Alysha's control of the bags falls within Matlock's ambit and, as a result, she had the authority to provide the consent on which the police relied.[8]

      iii.    Alysha's Status as a Confidential Informant

Distinct from his arguments regarding voluntariness and authority, Moran contests that Alysha's consent to officers was invalid because of the nature of her relationship with Bossi. Moran argues that Alysha was a confidential informant, and that her consent is

---

[8] This conclusion renders unnecessary an inquiry into apparent authority.

therefore invalid as a matter of law. The government retorts that Alysha was merely a cooperative tipster and not in any sense an "informant."

There is no dispute that Alysha had a pre-existing relationship with Bossi before the day of the search, that Alysha was once paid $50 by Bossi in exchange for information, and that Alysha and Bossi communicated both about Moran's case and other matters. The court needs not determine whether Alysha was a confidential informant or something less formal, because Moran does not provide (and the court has not found) authority for the proposition that a person's consent to search—otherwise valid—is rendered invalid if the person is an informant or cooperates with the police. Instead, Moran cites a line of cases elucidating a jurisprudence for determining whether a private party is sufficiently a state actor so as to be capable of inflicting constitutional injury. For example, Moran cites United States v. Walther, 652 F.2d 788, 791 (9th Cir. 1981), where the Ninth Circuit determined that an airline employee was sufficiently tethered to the DEA as to render the employee's search of a bag to be, in effect, the government's search. But that is of no moment: the issue is not whether *Alysha* unlawfully searched the bags. It is undisputed that the *police* searched the bags, and that the question is whether they could lawfully do so. The court answers that question in the affirmative.

### III. Conclusion

For the foregoing reasons, the Motion to Suppress [#54] is DENIED.

IT IS SO ORDERED.

October 5, 2017

/s/ Indira Talwani
United States District Judge

15